1822.

MURRAY
v.
DE ROTTEN-
HAM.

MURRAY and others *against* DE ROTTENHAM and others.

A certificate of discharge under the bankrupt law of the *United States*, of 1800, discharged the bankrupt from " all debts which were, or might be proved under the commission," and is a bar to *foreign*, as well as domestic creditors.

*M.* and *S.*, in 1799, conveyed a large tract of land to *J. S.*, in *trust* for their creditors residing in *Germany*, specially mortgaging a part of the land for three of their *German* creditors, particularly mentioned; and *M.* covenanted to pay and discharge all *taxes* and assessments that should be laid and charged on the land; and to discharge certain encumbrances specified, on parts of the trust land.

*M.*, without having performed any of these covenants, obtained his discharge u der the bankrupt law of the *United States*, in *October*, 1800; and the trustee, after a ds, with his own moneys, paid the *taxes* on the trust p operty; and paid off the encumbrances, and took an assignment of them to himself: *Held*, that the encumbrances being for debts certain, were provable under the commission, and *M.* was, therefore, discharged from his covenants for the payment of them; but not from his covenant to pay the *taxes*, which might, from time to time, be ch  d on the trust property; it being a personal and distinct engagement, for the protection and security of the trust estate : That the *trustee*, having made the advances in good faith, for the benefit and protection of the trust estate, was entitled to look to the estate, in the first instance, leaving the *cestui que trusts* to take the remedy, if any existed, against *M.*, by substitution; and that the trustee, moreover, under the assignment of the encumbrances to him, was entitled to his indemnity out of the portions of the lands encumbered, and redeemed by him.

*March* 10th.      THE *original* bill was filed in 1820, by *Joh R. Murray*, (trustee for the defendant, *Charles, Count De Rottenham* and others,) and the executors, heirs, and devisees of *John Murray*, deceased, against *Robert M'Menomy*, and *Jacob Mark*, as defendants. The bill was, afterwards, amended, by making *Louis Mark*, *Moretz Mark*, *Charles, Count De Rottenham*, *J. G. Sarasin*, and *J. P. Leerse*, parties defendants. *Jacob Mark*, afterwards, died, and a

*bill of revivor and supplement* was filed, making *Rosetta Mark*, the acting executrix of *Jacob Mark*, a defendant, with the surviving defendants. From the pleadings, documents, and proofs in the cause, the following facts appeared : *Jacob Mark*, and *John Speyer*, of the city of New York, who were merchants, under the firm of *Mark & Speyer*, being indebted to FREDERICK, COUNT DE ROTTENHAM, FREDERICK, BARON DE WEEKMAR, and FREDERICK MARK, in the sum of 40,000 dollars, and to sundry other persons residing in *Germany*, by deed, dated *December* 2, 1799, conveyed to *John Murray*, of *New-York*, in fee, *fourteen fifteenths* of the township of land No. 5., in the county of *Clinton*, in this state, containing *sixty-four thousand* acres, in *trust*, to hold the same for the security and payment, in the manner, order, and proportions, in the deed declared, of the debts due from *M. & S.*, to several *German* creditors, named separately, and to the above named three creditors, jointly, until the debts should be paid, or *Speyer* discharged from them. The trust deed contained powers to enable the trustee to convey to certain of the creditors, holders of shares in the township, on the terms therein prescribed, such proportion of the land as should be sufficient, at the price therein mentioned, to satisfy the debts of such creditors. The deed, also, contained other trusts, whereby a part of the trust lands, equal to *forty thousand* acres, was declared to be vested in the trustee, for security to the three *German* creditors above named, for the payment of the sum of 40,000 dollars loaned by them, with interest ; and the trustee was directed to treat these three creditors as special mortgagees, and conditional owners of the forty thousand acres, until their debt, with interest, and commissions, should be paid. The trust deed contained further powers, enabling the trustee to sell the trust property, in the manner, and under the limitations prescribed ; and there was a provision, that if the trustee should have died before the trusts were executed, and the plaintiff, *John R.*

1822.

MURRAY
v.
DE ROTTEN-
HAM.

*Murray*, should be capable of executing the trusts, the trust premises, and the trusts and powers, then subsisting and capable of performance, should vest in the plaintiff, *John R. M.*, in exclusion of the heirs, if any, of *John Murray*. The trust deed, also, contained *covenants* on the part of *Jacob Mark*, to pay and discharge, from time to time, all taxes and assessments that should, at any time, be assessed or charged on the trust lands ; and, as soon as conveniently might be, and within three years thereafter, being the time limited by the deed, to pay off and discharge the arrears of principal and interest then remaining unpaid on the mortgage mentioned in the trust deed, given by *Jacob Mark* to *Jacob & Robert Le Roy*, upon the one undivided *sixth* part of the township, and cause the mortgage to be cancelled ; and, also, to pay and satisfy *Arent J. Schuyler* what was yet due to him of the purchase money for one undivided *twelfth* part of the township, which he had sold, and contracted to convey to *Jacob Mark*, but which was then held by *A. J. Schuyler*, and for which he had a lien thereon ; and he covenanted, also, that the same should be conveyed to the trustee free from all encumbrances, &c.

After the 1st of *June*, 1800, *Mark & Speyer*, under the act of Congress, became bankrupts, and a joint commission issued against them on the 11th of *July*, 1800, and they were duly declared bankrupts, and obtained their certificates of discharge in *October*, 1800, and assignments, in due form, of their estate and effects, were executed. The amount due *J. & R. Le Roy* on the mortgage mentioned in the trust deed, not being paid by *Mark*, the trustee, *John Murray*, after the discharge of *Mark*, as a bankrupt, and after proceedings had been commenced on the mortgage, on the 16th of *July*, 1801, paid the amount due on the mortgage, being 1311 dollars and 81 cents, and 25 dollars for costs, out of his own funds, no trust moneys having then come to his hands ; and he took an assignment of the

bond and mortgage. In *April*, 1803, the money due to *A. J. Schuyler* being demanded, and no moneys or funds of the trust estate being in the hands of *J. M.*, the trustee, he paid *Schuyler* the amount due to him, being 1478 dollars and 20 cents, out of his own funds, and took a conveyance in fee from *Schuyler* to himself, of the *one twelfth* of the township. The trustee paid the *taxes* imposed on the trust property, out of his own moneys. No sales of the trust property were made by *John Murray*, nor were any rents received by him. The assignees of *Mark* claimed the trust estate as having reverted back, by reason of *Speyer's* discharge, or as being void. The *Count De Rottenham* died before the execution of the trust deed, and the countess, his widow, and guardian of his infant children, wrote to *John Murray*, on the 17th of *June*, 1800, requesting information. *J. M.*, on the 1st of *October*, 1800, answered the letter, stating the trusts above mentioned; that the land was encumbered with 1500 dollars, which he would discharge, if directed; that the title to 5333 acres was not received; that *M. & S.* were declared bankrupts. On the 19th of *May*, 1801, the trustee received a second letter from the *Countess De Rottenham*, and another from *Baron De Weekmar*, transmitting a power of attorney to him, and *S. Jones*, to act for them. These letters requested a speedy sale of the lands. The claim of the assignees of *Mark* being set up, the lands were not offered for sale; and in *December*, 1802, the trustee was advised by counsel, that the claim of the assignees was a conclusive objection to a sale, unless under direction of the Court of Chancery. The trustee, by letter of the 15th of *July*, 1803, informed the *Countess De Rottenham*, of his having paid the mortgage, and *Schuyler*, and taxes to the amount of 326 dollars and 38 cents; and on the 1st of *July*, 1807, he wrote to her, stating, that there was little prospect of payment, and advised the payment of taxes on the property, amounting to 1040 dollars; and, observ-

1822.

MURRAY
v.
DE ROTTEN-
HAM.

ing, that if the title to the land was good, it would not sell for more than three fifths of a dollar per acre. A suit in Chancery was commenced by the assignees, in *July*, 1806, to set aside the trust deed. *John Murray*, the trustee, died, pending the suit, having appointed the plaintiff, *John R. Murray*, and others, his executors. *John R. Murray* succeeded to the trust, and the suit in Chancery was decided in *September*, 1818, establishing the validity of the trust deed.(a) *Frederick Mark* died, leaving a widow, (who, afterwards, married *Baron De Stangel*,) and two children. *Charles, Count De Rottenham*, on the death of his father, *Frederick, Count De R.*, became entitled to his share of the trust property; and the share of *Baron De Weekmar* now belonged to his assignees, who were made defendants. All the creditors, or *cestui que trusts*, claiming under the trust deed, resided in *Europe*, except *Louis Mark*, son of *Frederick Mark*, deceased. Many of the *cestui que trusts* were dead, or had become bankrupt, and it was stated, by the plaintiffs, that their representatives were unknown. *Jacob Mark* died in *May*, 1821, having made his will, and appointed executors thereof.

The plaintiffs claimed, that the sums paid by *John Murray*, on the mortgage to *J. & R. Le Roy*, and to *Schuyler*, and that the sums paid by the former and present trustee, for taxes on the trust property, and for costs, counsel fees, and expenses, in defence of the suit, with interest, were chargeable on the trust estate, and the *cestui que trusts* rateably.

The defendants, who are representatives of the three *German* creditors above mentioned, insisted, that *Jacob Mark*, and his executors, are chargeable with those demands, under his covenants contained in the trust deed, and that the trustee ought to have compelled him to pay, and they averred, that he was able to pay. That the mort-

(a) See *M'Menomy* v. *Murray*, and *M'Menomy* v. *Roosevelt*, 3 *Johns. Ch. Rep.* 435. 446.; and, also, *M'Menomy* v. *Townsend & Ferrers*, 3 *Johns. Rep.* 71.

gage to *J. & R. Le Roy*, was chargeable wholly on the *one* sixth *;* and that the money due to *Schuyler* ought to be borne wholly by the *one twelfth ;* and that the three *German* creditors, above named, were entitled to 40,000 acres, clear of those encumbrances. The widow and executrix of *Jacob Mark*, insisted, that after his discharge under the bankrupt act, he was not responsible; nor were his executors, since his death, liable for either of those demands.

The plaintiffs, also, contended, that the trustee was bound to pay, or was justified in paying the sums due to *J. & R. Le Roy*, and to *Schuyler*, and for *taxes*, &c., for and on account of the *cestui que trusts*, and were not obliged to look to *Jacob Mark ;* but that the *cestui que trusts* were bound, at all events, to reimburse the trustee, with interest, and have their recourse against *Jacob Mark*, or his representatives, if they were liable over.

None of the *German* debts were proved under the commission of bankrupt ; and no dividends had been declared by the assignees.

It appeared, from the documents produced in the cause, that *Speyer*, in the autumn of 1794, in behalf of the partnership of *M. & S.*, went to *Germany*, his native country ; and during the years 1795 and 1796, purchased on credit, and shipped large quantities of goods to *New-York ;* that on the 1st of *February*, 1796, he borrowed 40,000 dollars of the three *German* creditors above mentioned, and gave them a special bond, executed for himself and his partner, *M. ;* by the terms of which, the loan was to be irrevocable for five years, and was payable in 1801, with interest, to be paid in *Germany*, at such place as the lenders should designate. For securing the payment of the sum so loaned, *M. & S.* mortgaged all their real and personal estate in *Europe* and *America*, and constituted as a special mortgage, out of their real estate in the state of *New-York*, 40,000 acres ; and *S.* engaged to procure, and send over to *Germany*, the requisite instrument for that purpose. The bond declared, that for the security of the lenders of the money,

1822.

MURRAY
v.
DE ROTTEN-
HAM.

*M. & S.* ceded to them 40,000 acres of their land, out of their lands in the state of *New-York.*

*M. & S.* dissolved their partnership on the 5th of *August,* 1799. *M.* agreed to assume all the debts, and to pay *S.* 10,000 dollars for his share in the concern. In the articles of dissolution, it was agreed, for the safety of the creditors residing in *Germany,* that *M.* should convey 60,000 acres of the lands belonging to the copartnership, in trust; and should discharge the mortgage to *J. & R. Le Roy;* and *M.* engaged to pay all the taxes to be laid on the lands.

*S. Jones,* for the plaintiffs.

*J. J. Roosevelt,* contra.

THE CHANCELLOR. This case has been argued with much ability, and the points raised admit of some latitude of discussion; but they have been rendered quite embarrassing by the complicated nature of the facts, and the distressingly voluminous documents in which they are involved.

1. The first point is, whether *Mark* continued bound by his personal covenants in the trust deed to *Murray,* after his discharge as a bankrupt.

A certificate of discharge under the bankrupt law of the *U. S.,* is a bar to *foreign,* as well as domestic debts, provable under the commission.

His debt of 40,000 dollars to *Count De Rottenham* and others, contracted in *Germany* in 1796, and payable there, was a debt which "might have been proved" under his commission of bankruptcy; and his certificate of discharge under the bankrupt act of the *United States,* in 1800, was, consequently, a bar to that debt. The bankrupt act of 1800 was general in its terms, and applied to all the bankrupt's estate, "whatsoever and wheresoever," and to "all, and every the creditors of such bankrupt who should come in and prove their debts under the commission;" and, also, to "all debts which were, or might have been proved under the commission." It was suggested, that if an insolvent, or bankrupt statute, did not, by express words, or by necessary construction, extend to extra-territorial, or foreign

contracts, it was not to be applied to them. But I do not apprehend, that we are to require an express declaration of the legislature, that foreign creditors are included in the operation of a bankrupt law, when the language of the statute is otherwise sufficiently general and comprehensive, and when the evident policy of the law is to embrace all debts that can be proved under the commission, and to give the unfortunate merchant, who conducts himself fairly, new credit in the commercial world, and new capacity for business. The question may not have been distinctly decided in the *English* Courts ; but, I should infer, from the general language of the *British* statutes of bankruptcy, and from the silence of the books, that it was the received, and undisputed doctrine there, that the certificate barred the foreign, as well as the domestic creditor. The case of *Lynch* v. *M'Kenny*, mentioned in *Quin* v. *Keefe*, (2 *H. Black.* 553.) strikes me as pretty decisive evidence of the *English* practice. Mr. Justice *Aston* discharged a bankrupt, who had obtained his certificate in *England*, from arrest by an *Irish* creditor, for a debt contracted in *Ireland*, because the debt arose before the commission, " and might have been proved under the commission."

The case of *Penniman* v. *Meigs*, (9 *Johns. Rep.* 325.) contains an express recognition of the rule, which, I presume, prevails equally in *England*, and in this country. It was there held, by the Supreme Court, that they were " bound to consider a discharge under the insolvent act of *this state*, as a bar to all suits brought *here* upon antecedent contracts, wherever made. The statute was peremptory and binding on our Courts. It was for the wisdom of the legislature to say, whether foreign contracts should be exempted from the operation of an insolvent act, but they have not made any such exception."(*a*) The insolvent act

(*a*) That case was decided in *October*, 1812. In the *revised act*, passed *April* 12, 1813, (sess. 36. ch. 98. sec. 8. 1 *N. R. L.* 460. 464.) the following exception is introduced. " Except debts due or owing to credit-

*1822.*

MURRAY
v.
DE ROTTENHAM.

1822.

MURRAY
v.
DE ROTTEN-
HAM.

referred to in that decision, did not *expressly* include foreign debts contracted abroad, any more than the bankrupt act of the *United States*, and it used only the general language of requiring three fourths in value of all the creditors to petition for the insolvent's discharge, and that he should exhibit a true account of " all his creditors, and the moneys owing to them," and that he should be discharged from " all such debts due at the time of the assignment, or contracted for before that time, though payable afterwards." It may, therefore, be considered as a case much in point ; and it was a decision well considered at the time, in respect to the question, (and which was the only question raised in this case,) and the language in which it was expressed was carefully selected.

There is a wide distinction between a discharge under the authority of the government where the suit is brought, and a discharge obtained abroad, which has no *authority* here, and is admissible only upon the ground of comity. In the latter case, a wide range is given to the operation of considerations growing out of the special circumstances of the case, or springing from enlarged views of justice and international policy. In the former, we have only to look to the fair and reasonable interpretation of the statute, and to give effect to its intention.

2. But, admitting *Mark* to have been discharged from his bond to the *German* creditors, the next, and the more difficult question is, whether his certificate was a discharge from the covenants contained in his trust deed to *Murray*.

That trust deed bears date the second day of *December*, 1799, and is one of the exhibits in the printed case which accompanies the proceedings in this cause. It contains

ors without the *United States*, who shall not petition for the insolvent's discharge, or come in and accept a dividend from the insolvent's estate, from the assignees, unless two thirds of all the insolvent's debts, including foreign debts, shall have been signed off, as before directed, in which last case, foreign, as well as domestic debts, shall be discharged." Vide *Holmes* v. *Remsen*, vol. 4. p. 460.

thirty-two closely printed pages in one continued unbroken section ; and it becomes, therefore, difficult to understand exactly the bearing and force of every part of such a deed, amidst a succession of " uses, trusts, powers, provisoes, restrictions, exceptions, reservations, conditions, and limitations." This deed conveyed to *Murray* fourteen fifteenths of township No. 5., in *Clinton* county, containing 64,000 acres of land, in trust, for the payment of several *German* creditors ; and it provided, that 40,000 acres should be held as a security for the payment of the 40,000 dollars borrowed of *Count De Rottenham* and others, in 1796, with the interest and commissions secured thereon ; and the trustee was to treat those creditors as special mortgagees of the 40,000, out of the 60,000 acres so conveyed in trust. In this deed, *Mark* covenanted to pay and discharge, from time to time, all taxes and assessments that should at any time be assessed or charged on the trust lands ; and that he should, as soon as conveniently might be thereafter, and within three years, discharge a mortgage given to *Jacob & Robert Le Roy*, on one undivided sixth part of the township ; and, also, pay and discharge a debt due to *A. J. Schuyler*, as the consideration for one undivided twelfth part of the said township, under his contract to convey the same to *Mark*, and that *Schuyler* should convey to *Murray* free of all encumbrances.

*Mark* was discharged under the bankrupt act in *October*, 1800, without performing either of those covenants ; and *Murray*, the trustee, was obliged, in 1801, after proceedings had been commenced upon the mortgage, to redeem the same with his own moneys, which he did accordingly, and took an assignment of the bond and mortgage. And the debt due *Schuyler* being demanded, he paid that, also, in 1803, out of his own funds, and took a conveyance of the one twelfth to himself. He also paid the taxes accruing and charged upon the trust lands subsequent to the bankruptcy and discharge of *Marks* ; and he now claims reimbursement and indemnity out of the trust property.

1822.

MURRAY
v.
DE ROTTEN-
HAM.

The representatives of the *German* creditors, who owned the bond debt of 40,000 dollars, insist, that *Mark* was responsible, notwithstanding his bankruptcy, under his covenants for those payments, and that the trustee was bound to look to him and his representatives for payment, and has no right to charge those payments to the trust estate.

*A trustee who has paid off encumbrances on the trust estate, with his own money, may look to the estate, in the first instance, for reimbursement, and is not bound to resort to the covenants of the grantor in the trust deed; but may leave the cestui que trusts to their remedy against the grantor, by substitution.*

Assuming that *Mark* continued responsible upon those covenants, notwithstanding his discharge, yet, I think, the trustee having made these advances in good faith, and for the benefit of the trust estate, is entitled, in equity, to look to that estate for his indemnity, in the first instance, and was not bound to resort to his precarious remedy against *Mark*. If any such remedy exists, the *cestui que trusts* may take the remedy by substitution under the trustee, after they shall have reimbursed him. The assignment of the mortgage, and the deed of *Schuyler*, are taken to him, in his own name, and he is entitled, under those instruments, to seek his indemnity from the portion of the lands conveyed by those deeds. Nothing can be more obviously just and reasonable. The covenant of *Mark* to pay those debts, was for a debt certain, or capable of being reduced to certainty, and provable under the commission; and I see no reason to doubt, that *Mark's* certificate was a good discharge as to his covenant to pay those debts. Every person who had taken securities payable at a future day, was, by the express words of the act, admitted to prove those debts equally as if they were payable presently. The only remedy of the trustee, is against the land vested in himself by those payments, and by the assignment of the mortgage, and the execution of *Schuyler's deed*.

The taxes were contingent debts, not existing at the time of the discharge. They were imposed subsequently, and, consequently, could not have been proved under the commission.

The counsel for the plaintiffs admits, that the taxes were not an existing debt, capable of being proved under the commission; but contends, nevertheless, that as the trust

deed, and the covenants connected with it, were given as a collateral security for the *German* debts, provable under the commission, a discharge from the debt was a discharge from the collateral security. The covenant, according to the argument, created no new debt; it was a personal engagement for an antecedent debt; and as the debt for which the trust deed, with its covenants, as a security, was provable under the commission, the certificate would be a bar to any form of action for the debt, in like manner as if the trust deed had contained a covenant for the payment of the same identical debt, or for the balance of it that should remain after exhausting the trust funds, a discharge from the debt would, of course, have been a discharge from the covenant. But this is not the correct view of the case. The covenant to pay the taxes was not a covenant to pay the debt, but to protect the pledge, and is a covenant as distinct from, and independent of the debt, as a covenant in a mortgage against encumbrances, or to insure the title. Such a covenant runs with the land, and is part and parcel of the security which the creditor may cling to, and waive the benefit of his dividends under the commission; and I see no reason why the creditor may not resort to the personal covenant of the debtor, for the purpose of rendering the security available. Those covenants might have been the great inducement to the taking of the pledge, and have been deemed essential to its value. If the breach of the covenant arose after the discharge, and did not relate to any certain and specific demand, capable of being proved under the commission, it is reasonable, and in conformity with the doctrine of the cases, that the covenantee should be entitled to his remedy, notwithstanding the certificate of discharge. The certificate is a bar only to debts and demands which were, or might have been proved under the commission, but not as against personal covenants and engagements which admitted of no satisfaction under the commission. If a demand be not admissible under the

1822.

MURRAY
v.
DE ROTTEN-
HAM.

A bankrupt's certificate does not discharge personal covenants in a trust deed, intended only to protect the trust estate, and which admitted of no satisfaction under the commission.

commission, it is not barred by the certificate. This is the just and settled rule; and to avoid the force and application of it, the counsel for the plaintiffs was obliged to contend, that the covenant to pay the taxes was, only in another form, a covenant to pay the debt. This was not exactly so. It was a covenant to give effect and value to a security taken partly to protect the debt; and was a collateral engagement, founded on the consideration of the acceptance of the security, and the different and various rights which that security was intended to protect.

Whether *Mark* would be indefinitely answerable under that covenant to the assignee, or purchaser of the trust property, is a question with which we have no concern. It is sufficient to decide the question arising between the parties in this case.

The bankrupt act of the *United States* was only a consolidation into one act, of the several *English* statutes of bankruptcy; and the decisions, and especially the principles settled under those statutes, in respect to their application, must be our rule of construction. From the time of *Elizabeth*, down to 4 and 5 *Anne*, the bankrupt continued liable for his debts, and the dividends under the commission were only considered as a payment *pro tanto*. The statute of *Anne*, for the first time, discharged the bankrupt *in toto*, from his debts; but the statute only applied to debts due at the time of the bankruptcy. The stat. 7 *Geo.* I., extended the statutes to debts contracted before the bankruptcy, though payable afterwards; and the statute of 19 *Geo.* II., extended the bankrupt laws to certain debts payable on a contingency, as *respondentia* bonds.

Under those statutes, the following decisions have the greatest bearing on the point before me:

In *Funtur* v. *Graham*, (cited in note to 8 *East*, 317., and S. C. in *Barnes'* notes, 69., under the name of *Centrel* v. *Graham*,) decided in C. B. in 1736, the defendant rented a house for years on lease, with the usual covenants, and within the time became a bankrupt. He was sued in

debt for the rent accrued after his certificate, and the Court held, that by the bankruptcy the lease became vested in the assignees, and the defendant ceased to be the tenant, and could not be chargeable for the rent accrued afterwards. But in *Mayor* v. *Steward,* (4 *Burr.* 2439.) a different decision took place, in a case somewhat similar, but under different circumstances. Land was demised to the plaintiff and the defendant, as partners, for fifteen years, at a yearly rent ; and the plaintiff released to the defendant his interest for the residue of the term, and the defendant covenanted to pay the rent, and indemnify the plaintiff. A breach was assigned in non-payment of rent ; and the defendant pleaded his discharge under the bankrupt act, since the making of the covenant. The Court held, that this was not a case between lessor·and lessee, founded on privity of contract, as in the former case ; but here was a detached, collateral, independent covenant, and the plaintiff could have had no remedy for a breach of it under the commission.

This last case applies with some force to the present. The defendant, there, was originally liable for the rent, and was discharged from any action for it, founded on the privity of contract ; but he was not discharged from a collateral covenant to pay the rent. The covenant to the plaintiff, in that case, was like the covenant in the present case, a collateral, detached, independent covenant, and he was held answerable, notwithstanding his certificate.

In *Wadham* v. *Marlowe,* (cited in 8 *East,* 314, note,) in the K. B. 25 *Geo.* III. the Court cited and followed the case of *Funtur* v. *Graham,* and held, that debt on the *reddendum,* would not lie against the lessee for rent accruing after his bankruptcy, when he had ceased to occupy the premises, and they had passed to the assignee, under the commission. But, afterwards, in *Mills* v. *Auriol,* (1 *H. Black.* 433. 4 *Term Rep.* 94.) the Court took a distinction between debt and covenant for rent in such a case, and

held the defendant liable, notwithstanding his bankruptcy, in one case, and not in the other ; and that too upon a technical distinction between an express covenant, founded upon the privity of contract, and debt founded upon the privity of estate. And, again, in *Boot* v. *Wilson*, (8 *East*, 311.) the K. B. went further, and held, that a parol promise or agreement to pay rent, took the case out of the certificate, as much as the covenant to pay rent.

There are a number of cases which establish, that if a surety or bail be fixed in that character, before the discharge of the principal, and are obliged to pay the debt after his discharge, the certificate of discharge is no bar, because the demand of the surety or bail was not provable under the commission, it not being, until payment, a debt due and owing. ( *Goddard* v. *Vanderheyden*, 3 *Wils*. 262. *Cockerill* v. *Owston*, 1 *Burr*. 436. *Frost* v. *Carter*, 1 *Johns. Cas.* 73. *Buel* v. *Gordon*, 6 *Johns. Rep.* 126. *Lansing* v. *Prendergrast*, 9 *Johns. Rep.* 127.) But the case which approaches the nearest in principle to the present one, is that of *The Mechanics and Farmers' Bank* v. *Capron*, (15 *Johns. Rep.* 467.) The defendant gave a note, discounted by the plaintiff for the benefit of the defendant, and which became due before his discharge under the insolvent act, but was not paid. The defendant endorsed another note, payable in four years, as collateral security for the first note, and he was discharged, within the four years, under the insolvent act. The Court held, that the discharge was no bar to an action upon the second note, because he was not fixed as endorser, at the time of his discharge. The claim on that collateral security, was conditional until then, and it was analogous to personal security, where no liability existed at the time of the discharge. The fact, " that the note was left as a collateral security for the prior note, due at the time of the assignment, did not prevent the application of the principle."

How, then, can the certificate of *Mark* be a discharge in

an action upon the covenant to pay the taxes, when the damages for non-payment of the taxes did not accrue before the certificate, and were then contingent, and could not have been proved under the commission, and when it was a distinct, detached, independent covenant, given to secure a pledge which embraced, not only the *German* bond of 40,000 dollars, but other demands and considerations? If the covenant had been made purposely to secure the *German* debt, yet, it being a collateral undertaking, arising on a distinct matter or cause of action, contingent in its nature, and not arising until after the discharge, it is no bar, within the doctrine of the cases cited. The *German* debt was the remote, but certainly not the proximate or immediate cause or consideration of the covenant. The trust deed, with its covenants, was given as well for the indemnity of *Speyer* as for the security of the *German* debts; and, I conclude, that *Mark* and his representatives remained liable, after his discharge, for the payment of the taxes accruing subsequent to his discharge.

But this is a question that does not appear to be necessarily connected with the present application of the trustee, to be indemnified for the payment of those taxes out of the very fund in hand. He has his remedy *in rem.* upon the fund, as well as upon the personal covenant of *Mark.* A trustee, who acts with good faith, is entitled to a prompt indemnity for his necessary disbursements and expenditures in the execution of his trust. He has a lien upon the trust property for them; and the *cestui que trusts* could never call that property out of his hands without first tendering him his indemnity. The payment of the taxes, from time to time, imposed upon the trust property, was indispensable to the preservation of the estate, and he is entitled to ask the *cestui que trusts* to refund to him, and to prosecute, on their own account, the representatives of *Mark*, upon a covenant taken essentially for their benefit. The covenant was, in form, a covenant to him, but it was,

1822.

MURRAY
v.
DE ROTTEN-
HAM.

A trustee, acting with good faith, is entitled to a prompt indemnity for his necessary disbursements and expenses, and has a *lien* on the trust property for them.

1822.
MURRAY
v.
DE ROTTEN-
HAM.

in effect and substance, a covenant to them, and the plaintiff was not obliged to sue *Mark*, without their directions, and at the risk of accumulating costs and expenses upon the trust fund. The probability was, that it was generally understood, and by the trustee himself, that *Mark* was discharged altogether from his covenants by his certificate as a bankrupt ; and if he was not, whether he had means to perform the covenants, does not appear. There is no ground to charge the plaintiff with neglect of duty, in not resorting to *Mark*, and I shall decree, that he be refunded for his payments and advances out of the trust estate.

The sums he paid to the *Le Roys*, and to *Schuyler*, ought, very clearly, to be charged upon that portion of the 60,000 acres covered by the mortgage, and by the *Schuyler* title ; and the taxes ought, also, to be equitably and rateably apportioned upon the trust property.

Without, therefore, deciding absolutely, for the present, upon the responsibility of the representatives of *Mark*, I shall afford to the plaintiff the substance of the relief sought by his bill.

It was " declared, that the amount paid by *John Murray*, for and in respect of the mortgage given to *J. & R. Le Roy*, for principal, interest, and costs, be chargeable upon the mortgaged premises, being the one undivided sixth part of the township No. 5., and that they ought to be reimbursed out of the proceeds of the sale thereof. That the amount paid to *A. J. Schuyler*, for the one undivided twelfth part of the township, be paid and reimbursed out of the same and the proceeds thereof. That the taxes upon the lands in the trust deed ought to be paid, and what has been paid, reimbursed out of the proceeds of the same, rateably and proportionably upon the respective quantities of interest therein, viz. the one sixth, the one twelfth, and upon the 40,000 acres remaining and mortgaged to the *German* bond creditors, being the residue of fifteen sixteenths, undivided parts of the said township. That the defendants, who represent

the *German* bond creditors, are entitled to the balance of the two third parts of the net proceeds of the fifteen sixteenths of the township, after deducting the proportional part of the taxes upon the township, with interest and charges, so chargeable upon the 40,000 acres as aforesaid, and after deducting, also, the commissions of the trustee, and the costs of suit, charges, counsel fees, and disbursements of *John Murray*, the original trustee, and of the plaintiff, his successor in the trust, paid out, payable, or chargeable concerning the defence of the suit in the pleadings mentioned in Chancery, and in the Court of Appeals, with interest, &c. And it was ordered, &c. that it be referred to a master, to take, and state an account in the premises, upon the principles above declared, and that the master allow, and charge against the one sixth, and the proceeds thereof, the moneys paid to the mortgagees aforesaid, for principal, interest, and costs, with interest thereon, &c. ; and, also, the rateable part, according to quantity of acres, of the taxes upon the township, with interest and charges ; and, also, for what has been paid for taxes, with interest, &c. ; and that the master, in taking the account, also charge against the one twelfth aforesaid, the money paid to *Schuyler*, or his representative, with interest, &c., and a rateable proportion of the taxes, &c., as aforesaid ; and that the master, in taking the account, also allow and charge against the 40,000 acres, and the proceeds thereof, a rateable proportion of the taxes aforesaid, as aforesaid, &c., together with a proportional part of the costs and charges aforesaid, &c., and commissions aforesaid, to the net proceeds of which 40,000 acres, subject to the deductions aforesaid, the defendants, representing the bond creditors, were declared to be entitled, and that the master report, &c., and that all further directions were reserved."